UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KELLY SARBACHER, an individual,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>AMERICOLD REALTY TRUST, an Oregon corporation; and AMERICOLD LOGISTICS, LLC, a Delaware Limited Liability Company,<br>　　　　　　Defendants. | Case No. 1:10-cv-429-BLW<br><br>**MEMORANDUM DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

The Court has before it two summary judgment motions. Plaintiff Kelly Sarbacher seeks a determination that severance pay qualifies as a wage under Idaho's Wage Act (Dkt. 44). Defendants AmeriCold Realty Trust and AmeriCold Logistics, LLC (collectively, "AmeriCold") has also moved for partial summary judgment on the same issue. AmeriCold also moves for summary judgment of Sarbacher's entire claim, arguing that Sarbacher was terminated for cause and is thus not entitled to severance pay in any event. (Dkt. 48).

The Court heard argument on November 2, 2011 and now issues its decision. For

the reasons explained below, the Court will grant Sarbacher's motion for partial summary judgment and deny in part and grant in part AmeriCold's motion.

## FACTUAL BACKGROUND

**1.      Sarbacher's Termination**

AmeriCold describes itself as "the world's largest full-service temperature controlled warehouse and logistics provider." *Mot. Memo. (Dkt. 49)*, at 1. In simpler terms, the company stores and keeps track of products for other businesses. One of AmeriCold's critical functions is to keep accurate records of the precise location of these products. This litigation concerns practices at AmeriCold's Ontario, Oregon facility. Sarbacher was the general manager of the Ontario facility for roughly 14 years, beginning in 1992.[1]

Warehouse employees at the Ontario facility keep track of a product's location manually. When products come into the facility, they are put in a designated location within the warehouse. Once that location is filled, remaining product is sent to a second location. If warehouse employees fail to document that some product was sent to a second location, the inventory shows up as missing once the product is removed from the first location.

During Sarbacher's tenure as general manager, the number of "missing" cases at

---

[1] Sarbacher began working in the Ontario facility in 1992. Around 20 months later, he "worked for Ore-Ida Foods on a contract for five years" and then returned to the Ontario facility in the Spring of 1998. *Sarbacher Dep. (Dkt. 56-1)* at 30:6–7 & 29:18 to 31:18. He continued to function as the general manager of the Ontario facility until his June 2010 termination

**MEMORANDUM DECISION AND ORDER - 2**

the Ontario facility was typically greater than 10,000.  Sarbacher testified that the number of missing cases did not affect the facility's overall operations.  He also testified that from the time he began working in the Ontario facility in 1992, if the physical inventory at a particular warehouse location did not match up with electronic records, warehouse staff would "roll" product while "they worked out the details."  *Sarbacher Dep.* at 35:11-20.

Rolling does not involve physically moving product; instead, employees would electronically move one product from its original, designated location in the warehouse to its next designated location or to a "phantom" location.  Sometimes, electronically moving the product to its next location would simply correct a warehouse error.  In other words, the location of physical product would eventually line up with the location listed in the electronic records.  Moving product into a "phantom" location resulted in the product no longer showing up as missing on electronic reports.

In 2007, AmeriCold instituted "Flash Reports."  These reports tracked various items, including the number of missing cases at each AmeriCold facility.  The goal was for each facility to have fewer than 1000 missing cases.  Nonetheless, the Ontario facility continued to roll product so that it consistently (and inaccurately) showed fewer than 1000 missing or "invalid" cases.

Sarbacher was terminated in June 2010.  In this action, he contends that AmeriCold improperly refused to pay the severance benefit provided for in his written employment agreement.  *See Employment Agmt., Ex. 1 to Nicholson Aff. (Dkt. 56-1) ¶ 2.*

**2.     Sarbacher's Employment Agreement**

The parties entered into the employment agreement at issue in June 1998. *Id.* The agreement provides for a one-year term of employment, which would automatically extend for successive one-year periods, unless either party gave notice of nonrenewal. *Id.* ¶ 1(b).

The agreement mentions severance several times. The preamble states:

> WHEREAS, as a condition to and in consideration of Employee's continued employment as an employee "at will," the participation in the long term incentive compensation plan of Americold Logistics, *severance payments provided*, and other good and valuable consideration, the Company and Employee are entering into this Agreement.

*Id.* at 1 (emphasis added).

Later, a chart sets out the following "type or types of compensation" payable to Sarbacher upon termination, indicating that the "Severance Benefit" is payable only if Sarbacher is terminated "without cause." *Id.* ¶ 5(c) (emphasis added). The agreement defines a "Termination for Cause" to include "misconduct involving fraud or dishonesty in the performance" of the employees' duties. *Id.* ¶ 5(d).

The agreement initially provided that severance payments (which were to paid in accordance with then-current payroll procedures) would cease if the employee "obtain[ed] substantially similar compensation . . . under a plan or program of any other employer . . . ." *Id.* ¶ 5(c). Under an addendum executed just a few weeks later, however, the parties agreed that "the Company shall pay the Severance Benefit as set forth above to

Employee whether or not Employee obtains compensation from another employer." *First Addendum (Dkt. 47-1)* ¶ 2.

## LEGAL STANDARD

One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id.* Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988). And a court is not obligated to take the non-movant's version of events as true when the account is blatantly contradicted by video evidence. *Scott v. Harris,* 550 U.S. 372, 378-81 (2007).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).  This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by her affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. *Celotex,* 477 U.S. at 324.  However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen,* 237 F.3d at 1029. Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

**1.     There are Triable Issues of Fact as to Whether Sarbacher was Terminated For Cause**

The threshold issue in these motions is whether the undisputed facts establish that Sarbacher was terminated for cause.

AmeriCold argues that because Sarbacher indisputably submitted false inventory reports, there is no question that the company fired him for cause.  Sarbacher, however,

has put forth evidence that AmeriCold allowed rolling practices at the Ontario facility for nearly 20 years. He says rolling practices were in place when he began working in the Ontario facility in 1992 and that one of his former supervisors, Mike Meline, later instructed him to under-report missing cases on inventory reports. *Sarbacher Dep. (Dkt. 56-1), at 34:23 to 35:6; id. at 37:20-24; id. at 79:16 to 81:21*. He also says that at least one other general manager at another AmeriCold facility engaged in rolling. *Id. at 36:9 to 38:7*.

Even after flash reports were instituted in 2007, Meline told Sarbacher to keep the number of reported "invalids" or "missings" "under the radar" – which Sarbacher understood to mean under 1,000. *Id. at 70:15-22 and 79:16-20*. Sarbacher describes his conversation with Meline as follows:

> Q:   With as much specificity as you can remember what do you recall you and Mike discussing as it relates to invalids during that initial conversation?
>
> A:   For us to get missing – if they wanted missing and negative numbers in there, there wasn't enough time – the Portland system spits out a report every 24 hours. And that has everything that hasn't been scrubbed yet. So there was not enough time for inventory control people to take the missing and negative and line those up and get those off the report to report it. And that is how the conversation started. You know, what do you want in there? And I was told to keep it under the radar. Which was 1,000.
>
> Q:   Who was the one that discussed there wasn't enough time to scrub the numbers. Is that you? Or was that Mike?
>
> A:   Both of us. And Mike had said at the time that he knew the information wasn't correct anyway. It's a moving target.

**MEMORANDUM DECISION AND ORDER - 7**

*Id.* at 79:10 to 81:6.

Later, in June 2008, when the Ontario flash report indicated an "invalid" number in excess of 10,000, Meline sent Sarbacher an email stating, "What is up with your invalids being over 10,000 cases? This is going to raise a red flag! Need plan to reduce asap." *Ex. 11 to Sarbacher Dep.* Sarbacher says Meline told him to get that number down gradually, so that it would not draw attention. *See Sarbacher Dep.* at 78:10-13.

There is evidence that Sarbacher was aware that his last supervisor – Mark Charles Smith – was a "stickler" and wanted flash reports to be accurate. (Smith began supervising Sarbacher in September 2009, around nine months before Sarbacher was terminated.) Additionally, just before Smith visited the Oregon facility in May 2010, Sarbacher instructed an employee to do what he could to "get the [missing] number down." *Id.* at 116:24.

Sarbacher also testified, however, that he was not concerned about the inaccurate "invalid" numbers on the reports because those numbers were not "part of our system [in Ontario]" and "didn't affect my operations." *Id.* at 86:6 to 87:13; *see also id.* at 105:17 to 106:20. He further testified that he was just "putting in numbers that I was told to put in" and "No one told me different." *Id.* at 105:17 to 106:20.

Viewing this evidence in Sarbacher's favor, Sarbacher received conflicting instructions regarding how to handle the "missing" or "invalids" on the electronic inventory reports, particularly in view of the longstanding practice of rolling (and under-

**MEMORANDUM DECISION AND ORDER - 8**

reporting "missings" or "invalids") at the Ontario facility. Further, there is some evidence that the rule regarding accurate reporting was not consistently enforced; Sarbacher indicates that other employees involved in submitting inaccurate inventory reports for the Ontario facility were not disciplined. *See, e.g., Goff Dep. (Dkt. 56-6)*, at 42:25 to 43:9; *Day Dep. (Dkt. 56-4)*, at 51:7-18.

All of this evidence, taken together and viewed in Sarbacher's favor, creates a triable factual issue as to whether rolling, and the related practice of under-reporting missings or invalids on inventory reports, constitutes "dishonest" or "fraudulent" conduct under the contract. Consequently, there are triable issues of fact as to whether Sarbacher was terminate for cause.

The parties also dispute whether AmeriCold's motive for terminating Sarbacher is relevant. Sarbacher has presented some evidence that he was fired because AmeriCold wanted to reduce its labor costs. Specifically, Smith discovered that Sarbacher was falsely reporting his "missings" on May 27, 2010, when Smith visited the Ontario facility. Roughly two weeks earlier, Smith had sent an e-mail to a human resources employee, Cathy Ledesma, stating: "I would like to make the move in letting Kelly go in the next 30 days. It is both performance driven, honesty,[2] integrity and a cost reduction . . . . Need you[r] input on how we can get this done." *May 10 email from Smith to Cathy Ledesma*,

---

[2] The "honesty" concerns raised at this point are unspecified and not developed in the briefing. But based on the record before the Court on this motion, it appears that Smith had not learned of the false inventory reports at the time he wrote this letter.

**MEMORANDUM DECISION AND ORDER - 9**

*Ex. 6 to Smith Depo (Dkt. 56-9).*

Ledesma advised Smith to draw up a performance improvement plan and Smith responded by asking, "What if it is just a reduction in PMs?" Ledesma again recommended putting Sarbacher on a performance improvement plan and Smith responded by saying, "I also really need to make a reduction for budget." Ledesma advised Smith of the "numbers if you were to RIF vs. terminate[.]" *See Ex. 6 to Smith Dep. (Dkt. 56-9)*, at DEF00465-70. The numbers for a RIF [reduction in force] included approximately $53,000 in severance pay. *Id.* at DEF00465. Sarbacher also testified that the day before he was fired, AmeriCold's Chief Financial Officer advised management personnel to cut "indirect labor" costs. As a managerial employee, Sarbacher's salary and benefits were classified as "indirect labor." *Sarbacher Dep.* 129:25 to 131:14.

AmeriCold disputes these facts, contending that Smith did not intend to terminate Sarbacher as of May 10, 2011 and, further, that cost-cutting played no role in the decision-making process. *See Reply (Dkt. 61)*, at 8-10. Additionally, AmeriCold argues that its motives in terminating Sarbacher are irrelevant because there is no dispute that Sarbacher materially breached the terms of his employment agreement by submitting false inventory reports. To support this argument, AmeriCold cites the following illustration from the Restatement (Second) of Contracts:

> A and B make an employment contract. After the service has begun, A, the employee, commits a material breach of his duty to give efficient service that would justify B in discharging him. B is not aware of this but discharges A for an inadequate reason. A has no claim against B for

**MEMORANDUM DECISION AND ORDER - 10**

discharging him

Restatement (Second) of Contracts § 237 cmt. c., illus. 8 (1981) (cited in *AmeriCold's Reply (Dkt. 61)*, at 9). AmeriCold also cites *College Point Boat Corp. v. United States*, 267 U.S. 12, 15 (1925) ("A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact.").

With these citations, AmeriCold apparently invokes the after-acquired evidence doctrine, which it has raised previously during these proceedings. *See Mot. Memo. (Dkt. 26)*, at 7 (citing the same authorities in connection with after-acquired evidence doctrine). One of the leading cases on this doctrine – *O'Day v. McDonnell Douglas Helicopter Co.*, 959 P.2d 792, 795 (Ariz. 1998) – explained the doctrine by quoting the same Restatement illustration and further noting that the Supreme Court "pre-Erie, had acknowledge this in *College Point Boat Corp. v. United States*, 267 U.S. 12, 15-16 (1925)." *See also, e.g., Teter v. Republic Parking Sys., Inc.*, 181 S.W. 3d 330, 339 (Tenn. 2005) (discussing development of the after-acquired evidence doctrine; noting that Restatement § 237, comment c, illustration 8 is "directly on point").

The "after-acquired evidence" doctrine precludes or limits an employee from receiving remedies for a wrongful discharge if the employer later discovers evidence of wrongdoing that would have led to the employee's termination had the employer known of the misconduct. *McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352, 360-63

(1995). There are at least two problems with AmeriCold's reliance on this doctrine.

First, in an earlier discovery order, this Court held that the after-acquired evidence doctrine does not apply to Sarbacher's claims. *See June 20, 2011 Order (Dkt. 39),* at 5 (denying motion to compel, noting that "the after-acquired evidence doctrine is forward looking, limiting damages for front pay and reinstatement, whereas the damages in this case are limited to severance pay allegedly due upon separation from employment").

Second, even assuming the doctrine applied, AmeriCold would have to show that it did indeed terminate Sarbacher for the alleged misconduct – not just that it could have done so. *See, e.g., O'Day v. McDonnell Douglas Helicopter Co.*, 79 F.3d 756, 759-60 (9th Cir. 1996). Consequently, AmeriCold's reasons for terminating Sarbacher are relevant to its contention that Sarbacher's alleged misconduct excuses it from any obligation to pay severance benefits. *Cf. O'Day*, 959 P.2d at 795 ("if the employee can demonstrate that the employer knew of the misconduct and chose to ignore it, then he will defeat the employer's attempted use of the after-acquired evidence and defense of legal excuse"); *Bergelson v. Laidlaw Transit, Inc.*, 141 F.3d 1173, 1998 WL 132970, at *5 (9th Cir. 1998) (unpublished table disposition) (evidence that employer knew of employees' alleged wrongdoing "raised a triable issue of fact as to whether Bergelson's conduct could even be classified as 'wrongdoing'").

This result makes sense in any event because the employment contract at issue states that a termination "for cause" is one "due to" specified events or occurrences,

including "misconduct involving fraud or dishonesty, . . . ." *Emplt. Agmt. (Dkt. 56-1)*, at 4. Given the evidence plaintiff has offered, there is a factual question as to whether AmeriCold terminated Sarbacher "due to" one of the specified, for-cause reasons (dishonesty or fraudulent conduct) or for some other reason (reducing costs). Summary judgment under these facts would be improper.

2.     **The Severance Benefit at Issue is a Wage**

If a jury determines Sarbacher was terminated without cause, he will be entitled to severance payments under his employment agreement. The parties dispute whether Sarbacher's severance constitute a "wage" under Idaho's Wage Act.

Idaho Code § 45-601(7) defines wages as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece or commission basis." Sarbacher argues that severance pay is undeniably a "wage" under the Wage Act based on the Idaho Supreme Court's holding in *Johnson v. Allied Stores Corp.*, 679 P.2d 640 (Idaho 1984). AmeriCold argues that (1) *Johnson* did not hold severance pay is a "wage," and (2) a more recent Idaho Supreme Court case, *Moore v. Omnicare, Inc.*, 118 P.3d 141 (2005) "unequivocally held that a contractual severance payment triggered by a no-cause termination . . . [is] not a 'wage' under the Idaho Wage Act, . . . ." *Defendants' Response (Dkt. 57)*, at 1. As will be explained, the Court concludes that *Johnson* controls.

In *Johnson,* the employer terminated a long-time employee, who sued for

severance pay. 679 P.2d at 643. Although the company no longer had a policy of paying severance to terminated employees, at one point during Johnson's 27 years of service, the company's policy manual provided that terminated employees would receive a severance, equal to two weeks' pay for each year of service. *Id.* The trial court granted summary judgment for the employer, concluding that Johnson's claim was barred by a six-month statutory limitations period. *See id.*

The relevant statute of limitations required employees to sue for "salary, wages, overtime compensation, penalties and liquidated damages" within two years. *See* Idaho Code § 45-608 (1984) (quoted in full in *Johnson*, 679 P.2d at 644). The same statute also contained a shorter, six-month limitations period, which applied if the employer had already paid the employee some amounts, but the employee claimed additional amounts were owing for that pay period. *Id.*

The Idaho Supreme Court concluded that the six-month limitations period could not logically apply because severance pay is not earned in any specific pay period, but instead, is "earned over the entire course of the employment relationship, . . . ." *Id.* at 644. Thus, the two-year statute of limitations applied. *Id.* To reach this holding, the court first explained that severance was bargained-for compensation, not a gratuity, and thus within the ambit of the Wage Act's statutory limitation periods:

> We previously held in *Thomas v. Ballou-Latimer Drug Co.*, 442 P.2d 747 (Idaho 1968), that a claim for an employee bonus, which was calculated by reference to the net profit of the defendant company and paid yearly, was part of the compensation bargained for in the agreement of employment.

> Because the bonus was part of the bargained for compensation, we held that a bonus claim came within the parameters of I.C. § 45-608. *By analogy, a claim for severance pay is also a component of the compensation in an employment agreement. Severance pay is not a mere gratuity.* Owens v. Press Publishing Co., 120 A.2d 442 (N.J. 1956). Thus, we hold that a claim for severance pay also comes within the parameters of I.C. § 45-608.

Id. at 367 (emphasis added, parallel case citations omitted).

As AmeriCold correctly points out, *Johnson* did not expressly hold that severance pay is a wage under Idaho's Wage Act. But such a holding is implicit, and many state and federal courts have cited *Johnson* as standing for this implicit, broader holding. *See, e.g., Latham v. Haney Seed Co.*, 807 P.2d 630, 632 (Idaho 1991) (*Johnson* "relied on *Thomas* by analogy in holding that severance pay 'is also a component of compensation in an employment agreement.'") (citing *Johnson*, 679 P.2d at 644). For example, Idaho Supreme Court Justice Jones described the law as follows in his dissenting opinion in *Paolini v. Albertson's Inc.*:

> This Court has previously held that various forms of compensation, including a deferred incentive compensation account, sales commissions and a share of company profits, *severance pay,* and year-end bonuses, can constitute wages under this statute.

149 P.3d 822, 827 (Idaho 2006) (Jones, J. dissenting) (emphasis added citing, among other cases, *Johnson*, 679 P.2d at 644). Obviously, a dissent has no precedential value, but this one is instructive because the quoted paragraph is drawn from the dissent's opening paragraphs, which simply lays out the general framework relating to wages.

The Ninth Circuit expressed a similar view of *Johnson* within the same dispute

**MEMORANDUM DECISION AND ORDER - 15**

between Paolini and Albertson's.  *See Paolini v. Albertson's, Inc.*, 418 F.3d 1023, 1026 n.3 (9th Cir. 2005).  In the federal case, the Ninth Circuit asked the Idaho Supreme Court to certify a related question – whether stock options could be wages under Idaho's Wage Act.  In explaining the need for guidance, the court noted that the Idaho Supreme Court had previously decided that various other forms of compensation – including severance pay – were wages.  *Id.* ("For example, the Idaho Supreme Court said . . . bonuses and severance pay are wages, *Johnson v. Allied Stores Corp.*, 679 P.2d 640, 644 (Idaho 1984).").  *See also Gomez v. MasTec N. Am., Inc.*, 284 Fed. Appx. 517, 519 (9th Cir. 2008) (unpublished disposition) (*Johnson* "clarified that a bonus or severance payment is a 'wage' if it is 'part of the compensation bargained for in the agreement of employment" and 'not a mere gratuity.'").

Finally, this Court has explained *Johnson* as follows:  "In *Johnson,* the Idaho Supreme Court held that severance pay is a 'wage' within the meaning of I.C. § 45-608, the Idaho Wage Act statute of limitations provision, because it is 'a component of the compensation in an employment agreement' and 'not a mere gratuity.'"  *Beach v. JD Lumber, Inc.*, Case No. 08-cv-416-N-EJL, 2010 WL 678955, at *17 (D. Idaho Feb. 23, 2010) (quoting *Johnson*, 679 P.2d at 640).

The Court agrees with these authorities:  *Johnson* stands for the proposition that severance pay is a wage under Idaho's Wage Act.  The Court rejects AmeriCold's argument that the contractual severance provision at issue here is, in actuality, a

liquidated damages clause similar to the contractual provision at issue in *Moore v. Omnicare, Inc.*, 118 P.3d 141 (Idaho 2005).

In *Moore*, the plaintiff entered into a five-year employment agreement with defendant. *Id.* at 145. The agreement provided that if plaintiff was terminated without cause within the five-year term, the employer would nonetheless pay Moore's salary for the remainder of the term. *Id.* The Idaho Supreme Court held that these payments "most closely resemble a claim for 'future wages.'" *Id.* at 149. Consequently, Moore's damages award could not be trebled under the Idaho Wage Act. *Id.* ("The Court of Appeals has previously alluded to the fact that claims for future wages do not fall within the purview of the mandatory trebling statute.") (citing *Whitlock v. Haney Seed Co.*, 759 P.2d 919, 924 (Idaho Ct. App. 1998)).

The contractual provision at issue here is distinguishable from the provision in Moore's contract. First, although labels are not necessarily controlling, the Sarbacher agreement repeatedly uses the term "severance," while the Moore contract did not. Indeed, as Sarbacher points out, the entire *Moore* opinion does not once use the term "severance."

Second, unlike Moore's agreement, the Sarbacher agreement expressly states that "severance payments" are part of the consideration given for the employment contract.

Third, unlike Moore's damages claim, Sarbacher's severance pay does not require the parties to figure out how much Sarbacher would have earned in any future, incomplete

part of his employment term. *Cf. Treolar v. County of Chaves*, 32 P.3d 803, 812 (N.M. Ct. App. 2001) ("Severance pay is not the same as liquidated damages.  Rather it is viewed as something that has been earned by the employee.").  Thus, the payments here do not logically qualify as payment for "future wages."

The Court does note one similarity in the contracts: both provide for the relevant payments only if the employee was terminated without cause.  Based on this similarity, AmeriCold argues Sarbacher's severance benefit is actually a liquidated damages provision – just like Moore's.  But the determinative factor in *Moore* was that the damages award ultimately called for a payment of future wages.  For the reasons discussed, the severance payment at issue here does not.  *Moore* is inapposite.

Finally, AmeriCold's citation to this Court's decision in *Beach v. JD Lumber, Inc.*, Case No. 08-cv-416-N-EJL, 2010 WL 678955 (D. Idaho Feb. 23, 2010) is unavailing.  *Beach* held that damages awarded to employees under a federal statute were not "wages." *Id.* at *17.  As the Court explained, the statutory damages were "obtained, but not earned, because the employee . . . [did] not provide services for wages, . . . ." *Id.* at *18.  Here, under the unambiguous terms of the employment contract, severance pay is an item of bargained-for compensation in exchange for services rendered.  Thus, under *Beach's* logic, Sarbacher's severance pay is a wage under prevailing Idaho authority.

3.      **Damages**

The parties agree that if Sarbacher is entitled to receive his severance benefit, he is

not entitled to seek the severance benefit *plus* treble damages; rather he will be entitled to seek the amount of the severance benefit, trebled. *See* Idaho Code § 45-615. As such, the Court will grant AmeriCold's request for partial summary judgment on this issue.

**IT IS ORDERED:**

1. Sarbacher's Motion for Partial Summary Judgment (Dkt. 44) is GRANTED.

2. AmeriCold's Motion for Summary Judgment and Alternative Motion for Partial Summary Judgment (Dkt 48) is GRANTED in part and DENIED in part.

3. The parties shall attend a telephonic status conference on December 2, 2011 at 11:00 a.m. Plaintiffs' counsel is directed to initiate the conference call. The Court can be reached at (208) 334-9145. The Court prefers that a conference operator be used to place the conference call.



DATED: **November 14, 2011**

_____
Honorable B. Lynn Winmill
Chief U. S. District Judge